IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

PLAINTIFF

CHRISTOPHER CARL ALBERTS

v.                          Civil No. 3:19-cv-03084
                                   3:20-cv-03047

NURSE JODY WOODS,                                          DEFENDANTS
Boone County Detention Center; and
DR. ABSALOM TILLEY,
Boone County Detention Center

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Christopher C. Alberts ("Alberts"), currently an inmate of the Wrightsville Unit
of the Arkansas Division of Correction, filed this civil rights action under 42 U.S.C. § 1983.
Alberts proceeds *pro se* and *in forma pauperis* ("IFP").   Alberts maintains he was denied adequate
medical care while incarcerated in the Boone County Detention Center ("BCDC").   Pursuant to
the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States
District Judge, referred this case to the undersigned for the purpose of making a Report and
Recommendation.

The case is before the Court on the Motion for Summary Judgment (ECF Nos. 50-52) filed
by Defendants.  Alberts has responded to the Motion.  (ECF Nos. 54-55).  Both sides have filed
reply briefs.  (ECF Nos. 56-57).

### I.      BACKGROUND

On September 23, 2019, Alberts was booked into the BCDC.  (ECF No. 50-1 at 9).  His
pharmacy records[1] and his hospital records were obtained.  *Id.*  The hospital records indicate

---

[1] Alberts has submitted a medication reconciliation dated 9/10/2019, which he contends is the date it was sent to Dr.
Tilley and Nurse Woods.  (ECF No. 54 at 12-13).  However, this date is prior to his incarceration in the BCDC.  The

Alberts was admitted to North Arkansas Regional Medical Center on September 21, 2019, following a motor vehicle accident resulting from high-speed pursuit involving the Harrison Police Department ("HPD").    *Id.* at 75-76, 83.    Alberts was transported by ambulance to the hospital. *Id.*   Alberts was complaining of jaw, left shoulder, chest wall, neck, back, and left foot pain.  *Id.* at 76.[2]  A CT of the thoracic spine showed no acute thoracic spinal findings.  (ECF No. 54 at 21). However, it showed "[b]ilateral ground glass changes within the mid to upper lungs.  The distribution suggests a systemic process such as pulmonary hemorrhage or edema.  Contusion and pneumonia not excluded."  *Id.*   A chest x-ray showed "[i]ndeterminate bilateral mid to upper lung air space opacifications.  Findings could represent pneumonia, contusion, edema, or hemorrhage. Continue follow up recommended."  *Id.* at 23.

On September 23, 2019, Dr. Tilley placed new orders and Alberts was notified of the orders.  (ECF No. 50-1 at 9).  Alberts was placed on a diabetic protocol.  *Id.* at 4.  On September 30, 2019, note was made that pictures of Alberts' injuries from his arrest by "HPD on 9-21-19" were taken pursuit to a request from the criminal investigation department ("CID").  *Id.* at 10.

On October 2, 2019, Alberts was seen by Dr. Tilley via video.  (ECF No. 50-1 at 11).  A urinalysis was requested due to Alberts' complaints of blood in his urine.  *Id.*   A urinalysis was obtained the following day and the results called in to Dr. Tilley.  *Id.* at 11, 122 (UA results).[3]  Dr.

---

reconciliation indicates Alberts was on the following medications and was taking and/or using them as directed:  Lasix 20 mg tablet once daily; nitroglycerin 0.4 mg sublingual tablet as needed at the sign of attack; aspirin 325 mg tablet once daily; FreeStyle lancets 28 gauge to check blood sugars six times daily; naproxen 500 mg tablet, two tablets daily as needed; lisinopril 40 mg tablet, two tablets to be taken in the morning; lancets, thin 23 gauge to check blood sugars six times daily and as needed; Lantus Solostar (3 ml) subcutaneous insulin pen, 70 units to be injected at breakfast and 70 units at bedtime; cyclobenzaprine 10 mg tablets, once daily as needed; amlodipine 5 mg tablet, once daily; pen needle, diabetic 31 gauge x 5/16 for use with insulin pens; techlite pen needles 31 x 6 mm, for use with insulin pens; FreeStyle lite strips, test ten times daily; and FreeStyle lite meter kit to check blood sugars six times daily.  *Id.* at 12.
[2] Defendants either received only a portion of the hospital records or elected not to submit some of the records as exhibits.
[3] Plaintiff also submitted the UA results.  (ECF No. 54 at 25).  Although the first column following the word Blood say negative, two columns over is a plus symbol and someone has circled that and written blood in the urine.  *Id.* While the plus symbol is circled on the copy submitted by Defendants, the words "blood in the urine" do not appear

Tilley ordered Bactrim tablets, twice a day, for one week.  *Id.*  On October 9, 2019, Alberts indicated he was still having urinary issues and Dr. Tilley ordered the Bactrim continued for another week.  *Id.*

On October 16, 2019, Alberts submitted a grievance complaining of blood in his urine, abdominal pain, and damage to his testicles and penis.  (ECF No. 54 at 8).  He complained he was not receiving the medication prescribed by the doctor.  *Id.*  He also stated he needed to see the doctor.  *Id.*  In response, he was told he needed to "fill out a paper medical request to the nurse." *Id.*  Alberts submitted another grievance on October 17, 2019, complaining of abdominal pain, blood in his stool, and pain in his kidneys.  *Id.* at 9.  In response, he was again told to turn in a paper medical request.  *Id.*  Alberts submitted a second grievance the same day asking for his meals to be "more diabetic healthy."  *Id.*  He indicated the meals were too starchy.  *Id.*  He asked for meat instead of cake and vegetables instead of rice.  *Id.*  In response, he was told to turn in a paper medical request.  *Id.*

A note made on October 17, 2019, documented that Alberts received his last dose of Bactrim in the morning and continued to complain of urinary issues.  (ECF No. 50-1 at 13). Another urinalysis was done, and the results were called in to Dr. Tilley.  *Id* at 11, 123 (UA results).  Dr. Tilley ordered Cipro tablets, twice a day, for one week.  *Id.* at 11.  A follow-up urinalysis was scheduled for October 25, 2019.  *Id.*

The next day, October 18, 2019, the jail administrator asked that Alberts be given another "sick call" based on "numerous complaints of medically related issues during" Alberts' court appearance that day.  (ECF No. 50-1 at 14).  According to Nurse Woods, a sick call request was received "shortly thereafter with numerous" complaints of "different issues and requesting

---

on the form.  (ECF No. 50-1 at 122).  Defendants' documents do not indicate which test results were called into Dr. Tilley.

to see the MD." *Id.*  It was noted Alberts had been seen on October 17th for complaints regarding his urinary issues, but he made no mention of the other issues discussed in court. *Id.* Dr. Tilley was advised of the sick call request and determined the complaints were non-urgent and could be addressed the following Monday.  *Id.*  While Nurse Woods indicated this request was placed in his chart, it is not within the summary judgment record.

On October 21, 2019, Alberts was brought to the medical unit for a sick call.  (ECF No. 50-1 at 15).  Alberts refused to sign the "paperwork for medical/tx purposes" and refused to "be billed." *Id.*  According to Nurse Woods, Alberts became argumentative and yelled that he "couldn't wait til I (this nurse) had to answer to his attorney!" *Id.*  Dr. Tilley, the nurse supervisor, and Sheriff Moore were "notified of refusals and behavior.  Medical care was not refused, but declined" by Alberts. *Id.*  A waiver of treatment ("WOT") form was completed for Alberts and a note made that he refused to sign it. *Id.* at 35.

On the same date, Alberts submitted the following grievance:

"i am still not been seen by any doctor for my bleeding and pain in my abdomen ... i am entitled to medical care by law and was refused medical care for not signing a form that makes me liable for payment ... according to law i am indigent and cannot be denied medical care and i am in danger right now ... this [d]enial of medical c[a]re is grounds for a law suit."

(ECF No. 54 at 9-10).  In response, Alberts was told: "You are not being denied medical if you have no funds.  You refused to sign the paperwork for treatment from the nurse[.]" *Id.* at 10.

On October 22, 2019, a WOT was completed noting Alberts had refused: "Accuv and insulin (Nov N)."  (ECF No. 50-1 at 36).  On October 22, 2019, a WOT was completed noting Alberts had refused: "Accuv and insulin (Nov N)." *Id.* at 36.

On October 23, 2019, Nurse Woods wrote that Alberts had submitted a sick call with numerous complaints and "insinuating that healthcare was being refused to him."  (ECF No. 50-1

at 17).  When Nurse Woods attempted to speak to him regarding his right to medical treatment, she indicates Alberts refused stating he wanted to speak to his attorney regarding his right to treatment issues.  *Id.*  Alberts refused to sign a waiver of treatment ("WOT") form for refusing his morning blood sugars check, Nov N, and Cipro.  *Id.; see also id.* at 37-38 (WOT forms).  WOT forms were also completed on October 24th, 25th, and 27th.  *Id.* at 39-41.

On October 28, 2019, Nurse Woods noted that Alberts continued to refuse his blood sugar checks and Nov N but occasionally took his as needed over-the-counter medication.  (ECF No. 50-1 at 19).  Nurse Woods indicated she attempted to speak to him about doing a blood test and a follow-up urinalysis.  *Id.*  Alberts refused instead asking for a list of his current medications.  *Id.* He was advised to place a written request for the list of his medications.  *Id.*  Officer Kauffman and Nurse Wood exited the cell to get the paperwork and Alberts called Nurse Woods "numerous vulgarities."  *Id.* at 19, 81.  When they returned with the WOT form and a paper for Alberts to sign to obtain the list of medications, Alberts got argumentative, refused to sign the WOT, but signed the request for a list of medications.  *Id.* at 19, 42-43 (WOT forms).   On October 29, 2019, Nurse Woods wrote that Alberts refused to get out of his bed for medication pass or to receive his list of prescriptions.  *Id.* at 19.  Nurse Woods also wrote that he continued to refuse to sign WOT forms. *Id.*  That same day, Alberts was observed ambulating up and down the stairs in the pod.  *Id.* at 21. Alberts current medications were listed as: Tylenol 500 mg as needed, Nov N insulin 50 units every am, and sliding scale Nov R am and pm.  *Id.* at 33-34.

On October 30, 2019, Alberts submitted a grievance complaining of severe abdominal pain, bleeding in his stool and urine, and asking to go to the hospital for "an internal scan."  (ECF No. 54 at 11).  He was told to fill out a paper medical request to see the nurse and/or the doctor.  *Id.* The following day, Alberts submitted another grievance stating: "now have dull burning in back

left side and sharp pains in abdomen ... still have blood in stool and urine ... whatever is wrong is getting worse ... i need to go to hospital ... not see a nurse [] who don[']t know what[']s wrong with me." *Id.*  Although it indicates this matter was resolved by Jason Day, his actual response is not provided to the Court.  *Id.*

On the following dates, Nurse Woods noted Alberts refused to get out of bed for morning medication pass:  October 29 through November 1, November 3 through December 4, 2019.  (ECF No. 50-1 at 22-26, 44-74 (WOT forms), 86-121 (WOT forms)).  On the evening of November 12, 2019, Alberts was given a clonidine tablet meant for another inmate.  *Id.* at 26.  His blood pressure was taken three times following this error.[4]  *Id.*  When Nurse Woods attempted to speak with Alberts about this error the following day, he refused to speak to her any further.  *Id.*  Alberts repeatedly indicated he wanted to call his attorney.  *Id.*

On November 19, 2019, Nurse Woods again noted Alberts refused his am blood sugars test and Nov N but did take his as needed over-the-counter medication in the evening.  (ECF No. 50-1 at 27).  Alberts asked Nurse Woods for her full name, title, etc.  *Id.*  She advised him to place a written request for the information and then the information would be provided.  *Id.*  Alberts asked about the medication administered to him in error.  *Id.*  He continued to ask questions about the right to received medical care, and the protocols for placing sick calls and medication pass were explained and he was told anything else had to be addressed through grievance, sick call, or a written request.  *Id.*  It was noted that Alberts became increasingly agitated and asked to return to his cell.  *Id.*

On December 4, 2019, it was noted that Alberts was being transferred to the Washington County Detention Center ("WCDC").   (ECF No. 50-1 at 28).  Nurse Woods called the WCDC

---

[4] Another report indicates the date of his error was November 14, 2019.  (ECF No. 50-1 at 79).

and gave a "detailed verbal report to medical." *Id.* On December 9, 2019, Alberts complained of blood in his urine and a urinalysis was obtained. *Id.* at 124. After the results were obtained, Alberts was added to review. *Id.*

On February 2, 2020, a urinalysis was positive for blood and Alberts was placed on review. (ECF No. 50-1 at 126). Alberts remained at the WCDC until February 6, 2020, when he was transported back to the BCDC. (ECF No. 50-1 at 29). When Alberts returned to the BCDC, he claimed to be non-ambulatory and unable to assist in some of his activities of daily living ("ADLs"). *Id.* at 30. Nurse Woods called and spoke with "medical" at the WCDC and was advised that Alberts could "walk with much difficulty and with assistance using his [wheelchair] as support." *Id.* When Nurse Woods attempted to speak with Alberts, he "was adamant that I was not allowed near him and that he was going to sue this nurse." *Id.* Nurse Woods consulted with Kara Black, the nurse supervisor, and both were "under the understanding that there are no legal records supporting that Pt can not ambulate nor take care of his ADL's independently." *Id.* It was concluded that his ADLs and ambulation/maneuvering should be independent as they were prior to his transfer to the WCDC. *Id.* The following day, Alberts was again transferred to the WCDC. *Id.* at 31.

On February 12, 2020, a urinalysis was done, and Alberts was found to have blood in his urine. (ECF No. 50-1 at 129). On February 17, Alberts was prescribed gabapentin because of his complaints of increased pain at night. *Id.* at 131. Nurse Kim from the WCDC called and advised that Alberts had hematuria noted in his urinalyses and permission was asked to send him for a urology consult. (ECF No. 50-1 at 31). Dr. Tilley was consulted and stated his belief that Alberts did not need to be seen by a urologist. *Id.* Nurse Kim was advised that the consult was not approved. *Id.* On February 20, another urinalysis was performed and blood in his urine was again

noted. *Id.* at 132. It was then determined that a urology consult should be scheduled. *Id.* at 133. Ozark Urology requested a urine culture. *Id.*

On February 27, 2020, Alberts was transferred back to the BCDC. (ECF No. 50-1 at 32). Nurse Woods spoke with Nurse Kathy at the WCDC to obtain current medication information. *Id.* Nurse Kathy advised that Alberts was still using his wheelchair but that he had been observed ambulating by jail staff. *Id.* Nurse Kathy indicated they had no medical records that "confirmed any diagnosis of ALS or MS." *Id.* Dr. Tilley ordered the same medications as Alberts had been on before: Metformin 1000 po BID, Glipizide 2.5 mg po Q AM, and Tylenol 500 mg, 2 tabs po BID PRN. *Id.* A wheelchair was going to be provided as it had at the WCDC for Alberts to use as needed. *Id.* The next day, it was noted that Alberts refused to speak to Nurse Woods, but that he knew how to access medical care. *Id.* On March 31, 2020, a urinalysis was done, and Bactrim prescribed for one week. *Id.* at 134.[5]

Alberts has submitted the following records from 2021: University of Arkansas for Medical Sciences ("UAMS") visit from July 13, 2021; a BCDC grievance from March 14, 2021; and a BCDC grievance from March 29, 2021. (ECF No. 54 at 5-7). While these records indicate Alberts is suffering from, or making complaints about, serious medical conditions, the records are not relevant to the time frame at issue in this case.

## II.     APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any

---

[5] The Court notes that neither Defendant has submitted an affidavit. Further, the record does not contain the deposition of the Plaintiff. Also absent from the record is Alberts' booking medical questionnaire, any intake health assessment performed, or any notes from Dr. Tilley. Although these are not required exhibits, it is rare for a summary judgment motion regarding medical claims not to contain these materials.

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with

the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a

genuine issue of material fact exists."  *National Bank of Com. v. Dow Chem. Co*., 165 F.3d 602,

607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient

evidence to support a jury verdict in their favor."  *Nat. Bank*, 165 F.3d at 607 (citing *Anderson v.

Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is

insufficient to survive a motion for summary judgment."  *Id*. (citing *Metge v. Baehler*, 762 F.2d

621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott

v. Harris*, 550 U.S. 372, 380 (2007).

### III.    DISCUSSION

Defendants maintain that each time Alberts requested treatment, his complaints were

responded to, assessed, and treated by medical staff at the BCDC, including the Defendants.[6]  (ECF

No. 50 at 1).  Defendants move for summary judgment on the following grounds:

First, they argue Nurse Woods did not have the ability to prescribe medication and the

claims against her should be dismissed.

---

[6] Nurse Woods has been sued in her individual capacity only.  (3:19-cv-03084 ECF No. 5 at 4).  However, Dr. Tilley was sued in both his individual and his official capacities.  (2:20-cv-03047 ECF No. 1 at 10).  The pending summary judgment motion does not address the official capacity claim.

Second, Defendants argue the only medical issue Alberts had was painful urination and alleged blood in his urine.  Defendants note that Dr. Tilley responded by ordering urinalyses and prescribing different antibiotics.  They maintain the medical records do not indicate that Alberts made any complaints about abdominal pain, damage to his testicles and penis, blood in stool, kidney pain, change in diet, or back pain.

Third, Defendants argue there is no evidence Alberts suffered from a serious medical need. Although Alberts made subjective complaints, Defendants argue the evidence is clear that Alberts was never diagnosed or presented with blood in his urine, abdominal pain, damage to his testicles and penis, blood in his stool, kidney pain, a need for a diet change, or back pain.  Defendants assert Alberts merely states he has these ailments in sick call requests or grievances without confirmation in any medical records.  *Id.*

Fourth, even assuming Alberts suffered from a serious medical need, Defendants argue they did not exhibit deliberate indifference to his needs.  They note urinalyses were ordered, and that Alberts was given three different courses of antibiotics involving two different antibiotics.

Finally, Defendants maintain Alberts has not identified any objectively verifiable injury resulting from a delay in care or treatment.  Defendants again point out that there is no documented evidence that Alberts suffered the injuries that he has alleged in his complaints.  Defendants state this is because Alberts "did not actually have blood in his urine, abdominal pain, damage to his testicles and penis, blood in stool, kidney pain, a needed to change his diet, or back pain."  (ECF No. 51 at 8).

### A.  Denial of Medical Care Claims Brought by Pretrial Detainees

Alberts was a pretrial detainee while housed in the BCDC.  Denial of medical claims brought by pretrial detainees are properly analyzed under the Due Process Clause of the Fourteenth

Amendment.  *See e.g., Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012).  The Eighth Circuit analyzes Fourteenth Amendment Due Process medical care claims under the deliberate indifference standard of the Eighth Amendment.  *See e.g., Morris v. Cradduck*, 954 F.3d 1055, 1055 (8th Cir. 2020) (pretrial detainee has the same rights to medical care under the Due Process Clause as an inmate has under the Eighth Amendment).  Therefore, the Court examines Alberts' claims under the Eighth Amendment's deliberate indifference standard.  *Morris*, 954 F.3d. at 1058.

To succeed on this type of claim, Alberts must demonstrate (1) that he had an objectively serious medical need, and (2) that Nurse Woods and/or Dr. Tilley knew of but deliberately disregarded that need.  *See Ivey v. Audrain Cnty., Mo.,* 968 F.3d 845, 848 (8th Cir. 2020) (cleaned up).  "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).  "To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the [detainee's] health."  *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (cleaned up).  The Eighth Circuit has stated that this "onerous standard requires a showing more than negligence, more than even gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate."  *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013) (cleaned up).

Prisoners "have no right to receive a particular or requested course of treatment," and prison doctors "remain free to exercise their independent medical judgment."  *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018).  Further, it is well settled that a prisoner's "mere difference of

11

opinion over matters of expert medical judgment or a course of medical treatment fails to give rise to a constitutional violation." *Id.* at 921-22.

### B.  Nurse Woods' Inability to Prescribe Medication

Defendants first argue they are entitled to summary judgment because Nurse Woods, a registered nurse, lacked the ability to prescribe medication.  While this is true, the Court does not read the Amended Complaint (Civil No. 3:19-cv-02084 (ECF No. 6)) this narrowly.  The only allegation connected to prescription medication is Alberts' allegation he was not *receiving* the medication. *Id.* at 4.  Alberts also alleges he had blood in his stool and urine, kidney and abdominal pain, broken toes, and head injuries for which he did not receive treatment. *Id.*  Further, he alleged he had asked to be taken to the hospital to determine the cause of the blood in his stool and urine as well as the abdominal pain. *Id.*  Clearly, Nurse Woods is not entitled to summary judgment on this ground.

### C.  Claims Limited to Painful Urination

Defendants second ground for summary judgment is that the only medical issue mentioned by Alberts were his allegations of painful urination and blood in his urine.  Defendants maintain they provided treatment for this condition.  The attempt to limit the denial of medical care claim only to Alberts' claim regarding his urination is not borne out by the record.  Defendants had Alberts' hospital records from September 21, 2019, which highlighted several issues regarding Alberts' health.  (ECF No. 50-1 at 75-76; ECF NO. 54 at 21-24).  Defendants also placed into his medical record a statement from the CID in which Alberts voiced issues related to his arrest on September 21, 2019.[7] *Id.* at 10.  Alberts was brought to the medical unit to have pictures taken of his injuries. *Id.*  A copy of the pictures was included in Alberts' medical chart. *Id.*  In addition to

---

[7] The CID statement was not provided to the Court.

his complaints of painful urination, Alberts complained of kidney pain.  *Id.* at 123.  In a note dated October 18, 2019, Nurse Woods indicates she received a sick call request from Alberts with numerous complaints of different issues.  *Id.* at 14.  Defendants also knew Alberts was a diabetic and was allegedly refusing his medication.  *Id.* at 17.  Nurse Woods' notes dated October 23, 2019, also indicate that Alberts submitted a sick call request with numerous complaints and maintained he was being refused medical care.[8]  *Id.*

Additionally, Defendants have submitted records indicating that Alberts could only walk with difficulty and with the assistance of a wheelchair for support while he was housed at the WCDC.  (ECF No. 50-1 at 30).[9]  While Alberts was housed in the WCDC, Dr. Tilley was advised that the urinalyses performed showed chronic blood in Alberts' urine and the WCDC sought approval of a urology consult.  *Id.* at 31.  The consultation referral was refused by Dr. Tilley.  *Id.* The WCDC medical provider apparently thought the condition was sufficiently serious that they ordered a urology consult despite Dr. Tilley's denial of financial assistance to pay for the consultation.  *Id.* at 132.  Alberts' claims extend beyond a simple complaint of blood in his urine that was resolved in October of 2019 by treatment with antibiotics.   Defendants are not entitled to summary judgment on this issue.

### D.  No Serious Medical Need

Defendants argue that Alberts was never diagnosed with blood in his urine, abdominal pain, damage to his testicles and penis, blood in his stool, a need for a diet change, or back pain.

---

[8] The sick call request does not appear in the record.
[9] Defendants seek to limit Alberts' claims to the period set forth in his complaints, September 21, 2019, through December 2019.  Defendants have, however, submitted records related to Alberts' incarceration in the WCDC which included records dated through February 2020 and his return to the BCDC.  (ECF No. 50-1 at 29, 124-133).  Further, Alberts' Complaint in 3:20-cv-03047 (ECF No. 1), against Dr. Tilley, covered the period from September 21, 2019, through July 7, 2020.  (Case No. 3:20-cv-03047 (ECF No. 1)).  In his response to Defendants' statement of facts, Alberts indicates the deliberate indifference and denial of medical care covered his entire 20-plus month incarceration at the BCDC.  (ECF No. 54 at 14).

Defendants contend these issues are based entirely by Alberts' subjective statements.   Defendants

therefore contend Alberts did not suffer from any serious medical needs.  The Court disagrees.  As

aptly stated by the court in *Nur v. Olmsted Cnty.*, No. 19-cv-2384, ___ F. Supp. 3d ___, 2021 WL

4444813 (D. Minn. Sept. 28, 2021):

> "There are two problems with this argument.  First, there are myriad serious medical
> conditions that are not readily visible to the naked eye but necessarily rely on a self-report
> in the first instance.  Epilepsy is surely such a condition.  So too are diabetes, Hepatitis C,
> HIV, and many other serious medical conditions.  In the first instance a detainee who
> suffers such a medical condition must necessarily self-report it to the jail.  It cannot be
> gainsaid that such a condition is a serious medical need.  In the facts and circumstances
> of this case, Nur's self-report gave rise to a duty to investigate to the extent necessary to
> allow Defendants to respond appropriately.
>
> But these observations really go to the issue whether Defendants were deliberately
> indifferent to the medical need (if it existed).  The objective inquiry focuses on whether
> Nur has presented evidence from which a factfinder could reasonably conclude he had a
> serious medical need at the time the care was withheld."

*Id*. at *7-8.

In addition to self-reporting various medical conditions, the objective evidence in the

summary judgment record establishes that Alberts did in fact suffer from several serious medical

conditions.   Thus, while Defendants deny the urinalyses showed any blood in Alberts' urine, Dr.

Tilley viewed Alberts' condition seriously enough to prescribe antibiotics on three separate

occasions.  This alone is sufficient to establish a serious medical condition.  A medical need is

objectively serious if it has been "diagnosed by a physician as requiring treatment."  *Schaub v.

VonWald*, 638 F.3d 905, 915 (8th Cir. 2011).  Further, Alberts was a diabetic.  There is sufficient

evidence in the record from which a reasonable factfinder could find that Alberts had one or more

serious medical needs.  Defendants are not entitled to summary judgment on the first prong of the

deliberate indifference standard.

### E.  Deliberate Indifference and Verifying Medical Evidence

Defendants next argue they exhibited no deliberate indifference to Alberts' serious medical needs.  They point out that Dr. Tilley ordered urinalyses and on three occasions and treated Alberts with antibiotics—Bactrim and Cipro.  (ECF No. 50-1 at 11-13).  They stress that Dr. Tilley also ordered a follow-up urinalysis that Alberts refused.  *Id.* at 18-19.  In Defendants' opinion, Alberts is merely disagreeing with the treatment given.  Further, they maintain Alberts has no medical evidence establishing that any delay in medical treatment had a detrimental effect on his prognosis.

On October 21, 2019, Nurse Woods noted that Alberts refused to "sign paperwork for treatment/medical care."  (ECF No. 50-1 at 16).  She noted that medical care was not *refused* but instead was *declined* by Alberts.  *Id.*  No example of the paperwork Alberts was asked to sign appears in the record; however, on October 21, 2019, Alberts maintained he was being refused medical "for not signing a form that makes me liable for payment."  (ECF No. 54 at 10).  In response, he was told he refused to "sign the paperwork for treatment from the nurse."  *Id.*  From this point on, it appears the relationship between Alberts and Nurse Woods deteriorated.  Other than the WOT forms completed by Nurse Woods, there is no evidence of Alberts having been seen by Dr. Tilley or Nurse Woods or having been given any medical treatment except being offered his daily medications.  When Alberts was transferred to the WCDC, each urinalysis taken showed blood in his urine.  This is highly suggestive of the fact that at least this issue had not been resolved.

Deliberate indifference is demonstrated when prison officials deny or delay access to treatment or fail to respond to serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  Further, deliberate indifference "can be inferred from facts that demonstrate" the response to the medical need was "obviously inadequate."  *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016).  When a prisoner's deliberate indifference claim is based on delay in the provision of

15

medical care, he must place verifying medical evidence in the record to support his claim that the delay had a detrimental effect on his medical conditions. *Corwin v. City of Indep.*, 829 F.3d 695, 698-99 (8th Cir. 2016). Defendants contend Alberts has no such evidence. This ignores, however, the fact that there is evidence of record, in the form of the records from the WCDC, that Alberts repeatedly had blood in his urine, one of the conditions he sought treatment for at the BCDC, and the source of this problem had not been discovered. When a urology consult was requested, Dr. Tilley refused despite having been told of the results of the urinalyses. Alberts also continued to complain of pain. Putting aside any other medical condition Alberts may have had, this alone is sufficient to satisfy the requirement that Alberts provide verifying medical evidence that the delay in treatment had a detrimental effect on his well-being. Defendants' assertion that Alberts has offered nothing but speculation or his own subjective beliefs is simply not borne out by the record.

In the absence of the Defendants' affidavits and based on the summary judgment record, the Court believes the record is such that there is a genuine issue of material fact as to whether the Defendants exhibited deliberate indifference to Alberts' serious medical needs or denied Alberts medical care simply because he refused to sign a proffered form. In short, the Court believes there is sufficient probative evidence in the record to permit a finding in Alberts' favor. *Moore ex rel. Moore v. Briggs*, 381 F.3d 771, 774 (8th Cir. 2004) (summary judgment analysis must be based on record evidence). Defendants are not entitled to summary judgment on this prong of the deliberate indifference standard.

## V.   CONCLUSION

For these reasons, it is recommended that Defendants' Motion for Summary Judgment (ECF No.  50) be **DENIED and this case proceed to trial.**

16

The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 6th day of April 2022.

/s/ *Mark E. Ford*

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE